WISEMAN *v.* DYESS.

4-3550

Opinion delivered June 11, 1934.

*Earl R. Wiseman, Hal L. Norwood,* Attorney General, and *Pat Mehaffy,* Assistant, for appellant.

*Leon B. Catlett,* for appellee.

SMITH, J. This suit was instituted by the Administrator of Federal Emergency Relief in this State to enjoin the State Commissioner of Revenues from collecting a license tax on automobiles, and a tax on gasoline consumed in operating therein, which are used in this State and purchased out of funds made available to the State of Arkansas under the Federal Emergency Relief Act passed by the Congress on March 12, 1933.

The cause was tried under the following agreed statement of facts: "Under the provisions of the Federal Relief Act of the Congress of the United States approved May 12, 1933, the President of the United States appointed Harry L. Hopkins as Federal Emergency Relief Administrator, and the latter has duly appointed the plaintiff, W. R. Dyess, as Emergency Relief Administrator for Arkansas, who has duly qualified and is acting as such administrator and who brings this action in that capacity. The said W. R. Dyess, in such capacity as Emergency Relief Administrator, appoints and sets the salaries of all employees of Emergency Relief Administration, subject to the approval of the said Harry L. Hopkins, which Emergency Relief Administration is the name designate of the Arkansas unit of said Federal Emergency

Relief Administration, of which said Harry L. Hopkins is the national head. The said W. R. Dyess, as such administrator, determines the amount necessary for federal relief in this State and presents said data to the Governor of the State of Arkansas, who signs requisitions therefor on blanks provided by said Emergency Relief Administration. A copy of such application is attached hereto. The Federal Relief Administrator then makes the grant for relief within the State and United States checks for the designated amount, which are payable to J. M. Futrell, Governor of Arkansas, are then forwarded by the agency of the Federal Government to said Governor. The latter indorses said checks, delivers them to said W. R. Dyess as Emergency Relief Administrator and takes a receipt therefor, a copy of which is hereto attached. The said Emergency Relief Administrator then indorses said checks and deposits them in Little Rock banks, and other banks in the State, to the credit of Emergency Relief Administration, which dispenses same in accordance with said act of Congress and the amendments thereto. All expenditures are supervised by field superintendents from the Washington office of the Federal Emergency Relief Administration, and reports of all expenditures of said money are duly and regularly made to the Federal Relief Administration in Washington.

"It is now the policy of the said Federal Emergency Relief Administration to purchase, out of the funds granted for relief within the State, certain livestock, including horses, mules, cattle and hogs, and to sell same to persons on the relief rolls and who are unable to provide same. The purpose thereof is to put a number of such financially destitute persons back on the land where they can make their own living. Mortgages are taken on said livestock so sold, with a low rate of interest, and an opportunity to repay the amount. Said mortgages are taken in the name of Emergency Relief Administration, the Arkansas unit of said Federal Relief Administration, in such legal manner as to be binding on the purchasers. All of the funds used in the purchase and distribution of said livestock are furnished by the United States Gov-

ernment, granted for relief within the State, as herein outlined.

"In order to provide for the distribution of said livestock, it has become necessary for the Arkansas unit of Federal Emergency Relief Administration to purchase a number of motor vehicles, including automobiles, trucks and trailers, with which to distribute such livestock, and, after such distribution, to superintend its care and the repayment of the purchase price. The said motor vehicles are, and will continue to be, used exclusively for that purpose, and the purchase price of said motor vehicles is paid solely out of the funds granted, as herein stated, for relief within the State of Arkansas.

"The said Earl R. Wiseman is the duly appointed, qualified and acting Commissioner of Revenues of the State and is threatening to collect motor vehicle license fees on such motor vehicles and a tax on the gasoline used in such vehicles."

The court held that the automobiles used as stated were the property of the United States Government, and that neither they nor the gasoline used in their operation were subject to taxation, and this appeal is from that decree.

For the reversal of this decree it is insisted that the act of Congress granted the funds spent in this State to the State, thereby passing the title to the State, and upon becoming State funds were subject to the tax, as the State legislation imposing the tax had not exempted such funds from taxation.

It is unnecessary to consider or to decide what the state of the law would be if the funds apportioned to this State had become the property of the State, as, in our opinion, that result was not intended and has not been accomplished. It is our opinion that these funds and the automobiles for which a portion of the funds had been expended were and are Federal property, and as such are not subject to taxation by the State. It is true the act of Congress refers to the apportionment of these funds to the States "as grants to the several States," but it does not appear that such a donation thereof was made as to

pass the title and control thereof from the Federal Government. They are—and continue to be—Federal funds, subject to the supervision of the Federal Government in their disbursement. The State has no control over the expenditure of these funds. It does appear that, for the convenience of the Federal administrator, and to expedite the distribution of the Federal Government's bounty, application for the funds is made by the Governor of the State, who signs the receipt therefor and indorses the check used in remitting the funds, but when he has done so he delivers the indorsed check to the plaintiff State administrator for distribution. The clerical acts mentioned comprise the full extent of the authority and duty of the Governor. No other officer, agent or employee of the State has any control or supervision of the funds, or of the property purchased therewith. The Governor of the State acts merely as the agent or intermediary employed by the Federal Government in discharge of the beneficent purpose of the congressional act. The checks are delivered upon indorsement to the plaintiff, who was appointed by the national administrator, and the persons who make the actual disbursement are all Federal employees, who are not subject to the control or supervision of any officer of the State. No reports of expenditures are made to the Governor, but such reports are made to the national administrator, who appointed the State administrator, and the national administrator makes report to the President of the United States and to the Congress of the manner in which and the purposes for which the money was expended. The act of Congress under which the apportionments are granted requires this, and negatives the idea that an absolute grant or gift had been made to the State. If, by any possibility, any of the funds thus apportioned were not required, the unexpended balance would revert, not to the State, but to the Federal Government.

The title to the automobiles is in the United States, and not in this State. It is stipulated that the purchase and use of these automobiles was and is in aid and in furtherance of the congressional program for the amelio-

ration of the emergency which induced the passage of the legislation. As to what would be done with the automobiles when the use of them for the purposes for which they are now employed has ceased is a question not presented by the record before us. They are now used for a Federal purpose, and, if so, they are not subject to taxation; nor is the gasoline required to run them subject to taxation.

A similar question was involved in the case of *Panhandle Oil Co.* v. *State of Mississippi*, 277 U. S. 218, 48 S. Ct. 451, 56 A. L. R. 583. There the State of Mississippi sued to recover taxes claimed on account of sales of gasoline made for the use of the Federal Coast Guard Fleet in service in the Gulf of Mexico and its Veterans' Hospital at Gulfport in that State. The Supreme Court of Mississippi held the exaction a valid privilege tax measured by the number of gallons of gasoline sold; that it was not a tax upon instrumentalities of the Federal Government, and that the United States was not entitled to buy such gasoline without the taxes charged other users of gasoline being paid. 147 Miss. 663, 112 So. 584.

In reversing this case the Supreme Court of the United States held, in the case first cited, that: "While Mississippi may impose charges upon petitioner (the dealer who sold the gasoline) for the privilege of carrying on trade that is subject to the power of the State, it may not lay any tax upon transactions by which the United States secures the things desired for its governmental purposes."

In the case of *Johnson* v. *State of Maryland*, 254 U. S. 51, 41 S. Ct. 16, it was held (to quote the headnote) that: "A law of a State penalizing those who operate motor trucks on highways without having obtained licenses based on examination of competency and payment of a fee, can not constitutionally apply to an employee of the Post Office Department while engaged in driving a government motor truck over a postroad in the performance of his official duty."

In that opinion it was said: "With regard to taxation, no matter how reasonable, or how universal and undiscriminating, the State's inability to interfere has

been regarded as established since *McCulloch* v. *Maryland,* 4 Wheat. 316. The decision in that case was not put upon any consideration of degree but upon the entire absence of power on the part of the States to touch, in that way at least, the instrumentalities of the United States (4 Wheat. 429, 430) and that is the law today.''

See also *Grayburg Oil Co.* v. *Texas,* 278 U. S. 582, 49 S. Ct. 185, reversing the decision of the Supreme Court of Texas, [3 S. W. (2d) 427], holding that the State had the right to collect a tax on gasoline sold to the United States and delivered on a military reservation in that State.

It is provided, in § 35 of act 65 of the Acts of 1929 (vol. 1, Acts 1929, page 309), that motor vehicles belonging to the United States Government and used in its business exclusively shall not be required to pay any motor vehicle fuel tax nor to pay a license fee on such vehicles, thus recognizing the exemption from taxation and the absence of any purpose to collect such a tax.

We have not overlooked act 108 of the Acts of 1933, page 329, which does not affect the conclusion announced.

The decree of the court below is correct, and is therefore affirmed.